PRESENT: Powell, C.J., Kelsey, Chafin, Russell, Mann, and Fulton JJ., and Goodwyn, S.J.

DOUGLAS BELL WESSEL

v.  Record No. 251004

OPINION BY
JUSTICE JUNIUS P. FULTON, III
JUNE 4, 2026

VIRGINIA STATE BAR EX REL. FIFTH
DISTRICT, SECTION II COMMITTEE


FROM THE FAIRFAX CIRCUIT COURT
The Honorable James E. Plowman, Jr., Chief Judge Designate, David M. Barredo, Judge
Designate and Edward A. Robbins, Jr., Judge Designate

Douglas Bell Wessel, a licensed Virginia lawyer, represented Mariela Perez in a personal

injury action against Merrifield Garden Center ("Merrifield"). As the date of trial approached, a

fee dispute arose concerning whether Wessel or Perez would be responsible for additional legal

counsel's fees. Wessel then began to deceive Perez, pretending to prepare for trial when he had

no intention of trying the case. In the weeks preceding the impending trial, Perez lost trust in

Wessel and eventually terminated him immediately after her case settled. Even after he was

terminated, Wessel tried to influence the distribution of settlement funds, refusing to even allow

the disbursement of funds which undisputedly belonged to Perez.

The Virginia State Bar ("VSB") asserted that Wessel's actions constituted misconduct and

the violation of multiple Rules of Professional Conduct. A three-judge panel was appointed, and

it agreed with the VSB. Wessel appeals to this Court, asking us to reverse those findings. We

will not do so. As the facts before us demonstrate, Wessel misled his client in order to maintain

control over her case and ultimately enrich himself. Consequentially, we affirm the judgment of

the three-judge panel.

## I. BACKGROUND

In 2019, Mariela Perez was injured at Merrifield when an electric utility cart malfunctioned. Her injuries required multiple surgeries on her leg. When Merrifield stopped communicating with the hospital regarding payment for her treatment, Perez was advised to find legal counsel to represent her. She found Douglas Wessel online and reached out to him for assistance. Wessel agreed to take on her case, and they executed a representation agreement on July 17, 2019.

This agreement stated, in part, that Wessel would represent her for any claims that arose out of her accident at Merrifield. It required that if he was terminated or withdrew from representation, that she would owe him costs incurred. The representation agreement also gave Wessel a valid lien for up to 40% of any recovery. Wessel filed suit against Merrifield in 2021, and the trial was set for October of 2023.

However, in August of 2023, just two months prior to the trial date, Wessel realized that he needed the assistance of other legal counsel to address a potential causation issue[1] and reached out to Robert Stoney. Stoney agreed to assist but did not agree to be Perez's counsel of record or participate in the trial of the case. Stoney later testified that Wessel initially agreed to pay his fee from Wessel's own portion of the recovery, though the letter from Stoney to Wessel memorializing their working relationship does not specify this.

Soon after Wessel hired Stoney, Wessel again realized that he needed additional assistance. Stoney recommended his law partner, Juli Porto, who agreed to assist. The letter from Juli Porto to Perez and Wessel indicated that her fees would be paid "from Wessel Law

---

[1] Wessel was looking into a potential products liability issue related to the electric utility cart.

Office's contingency fee unless you and Wessel Law Offices agree that you will pay a portion of those fees out of our own recovery."

On September 12, 2023, Wessel and Perez spoke by phone and, for the first time, Wessel explained that the representation agreement required Perez to be solely responsible to pay for Stoney and Porto, not him. Perez vehemently disagreed, as this was not her understanding of their representation agreement. Wessel and Perez argued regarding the fee arrangement, and the relationship quickly deteriorated. At one point, Perez agreed to pay an indeterminate amount of Stoney and Porto's fees, but then quickly changed her mind, and continued to refuse to pay any of their fees. Wessel later testified that a few days after the September 12, 2023 conversation, he decided that he would not try the case as "This can't go forward." Wessel did not communicate this decision to Perez or Stoney.

As trial neared, Wessel submitted witness lists and Stoney engaged in settlement discussions with opposing counsel. At this point, Wessel and Stoney believed that there was a "95% chance" that the case would settle, but the tension between Wessel and Perez showed no signs of easing. Wessel knew that he could withdraw given the fee disagreements he had with Perez, but he chose to stay on in order to not "kill the case."

On September 26, 2023, in a conference call, Wessel, Stoney, Porto, and Perez met to discuss the case in anticipation of the approaching trial. During this call, Wessel told Perez that "it would be difficult for him to try the case" given their disagreements about fees, though he did not explicitly say that he would not try her case. Perez was immensely upset about this and continued to refuse to cover Stoney's and Porto's fees. A few hours after the call, Wessel reached out to Perez and offered to cover Stoney and Porto's fees out of his own fee.

3

A few days after the September 26 conference call, Stoney and Wessel met to discuss the case. At this meeting, Wessel told Stoney for the first time that he had no intention of trying the case. Stoney was "shocked," and asked if Perez knew Wessel's intentions. Wessel said that he thought she did, though Stoney disagreed. Stoney testified that Wessel told him that he planned to "pretend" that he was going to try the case in an effort to deceive Merrifield, and then, if settlement failed, he would nonsuit. Wessel claimed that his decision was in Perez's best interests, because if he withdrew, it would "kill" any chance of settlement. Stoney and Porto were not pleased with Wessel's plan and told him that "they did not sign up for a bluff." Stoney encouraged Wessel to advise Perez of his intended course of action, but Wessel delayed.

On October 10, 2023, opposing counsel made a one-million-dollar settlement offer. While considering the offer, Perez asked Wessel for a full accounting of his fee and costs in order to weigh her options. Wessel initially refused to provide his accounting, because he said it would interfere with his preparation for trial, but later provided the requested documentation. It was at this point, less than two weeks before trial, that Wessel finally told Perez that he had no intention of trying her case. Stoney then advised Perez to speak to independent counsel.

On October 13, 2023, Wessel won a Motion in Limine for Perez's case. Despite this win, Wessel continued to believe that he could not try Perez's case.

On October 19, 2023, the parties agreed to settle for $1.2 million. A few hours after the settlement was finalized, Perez terminated Wessel.

On October 20, 2023, Wessel reached out to the Virginia State Bar Ethics Hotline to ask how fees should be handled and if he should withdraw. The VSB recommended that he withdraw and that the "funding contract and settlement agreement" control the disbursement of the funds, but ultimately it was a legal issue. Wessel reached out to Perez and said that he

4

believed that rather than Stoney, he should be the one to disburse the funds under their representation agreement and that the agreement required any disagreement about disbursement to be resolved through arbitration. Despite the VSB's advice, Wessel did not file a motion to withdraw.

Stoney also contacted the Virginia State Bar Ethics Hotline to ask about disbursement. The Bar advised him that disbursement is a purely legal issue, and that any undisputed funds should be immediately distributed to the client, and any funds in dispute can be held in trust until the dispute is resolved.

Over the next few weeks, Wessel and Stoney disagreed about who should be paid out of the settlement funds first. Wessel argued that he and any lenders[2] were required be paid first under the representation agreement, even if the lienholder's claim amounts were disputed. In contrast, Stoney believed that Perez should be paid the undisputed portion of the settlement funds first. Stoney repeatedly reached out to Wessel to try and get his approval on various disbursement options, but Wessel continued to object.

Wessel contacted the Virginia State Bar Ethics Hotline again on December 7, 2023, and asked if he should withdraw at that point, despite the continuing disagreements regarding the disbursement of settlement funds. Once again, the VSB recommended that Wessel should withdraw.

On December 8, 2023, Wessel, Perez, Stoney, and Porto attended a hearing to resolve the fee dispute. The trial court ruled that Perez should immediately receive $600,000, her undisputed portion of the settlement, and that the rest would be held by the trial court until the

_____

[2] Wessel took out various loans to help cover litigation expenses throughout the pendency of the case.

5

fee dispute was resolved. It was at this hearing that Wessel finally submitted an agreed order to withdraw from the case. At no point before this hearing did Wessel file any motion or otherwise seek permission to withdraw.

Perez then filed a bar complaint against Wessel. The VSB investigated and alleged that he violated Rules 1.3(b), 1.16(a)(1) and (a)(3), and 1.15(b)(4), and 8.4(a). A three-judge panel concluded that Wessel did indeed violate each of these rules and suspended Wessel's license to practice law in the Commonwealth for a period of 13 months. Wessel now appeals to this Court.

## II. ANALYSIS

### A. Standard of Review

The standard of review for a matter of attorney discipline is as follows:

> We conduct an independent examination of the entire record. We consider the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the Bar, the prevailing party [below]. We accord the [Board's] factual findings substantial weight and view those findings as prima facie correct. Although we do not give the [Board's] conclusions the weight of a jury verdict, we will sustain those conclusions unless it appears that they are not justified by a reasonable view of the evidence or are contrary to law.

*Pappas v. Virginia State Bar*, 271 Va. 580, 585-86 (2006) (quoting *Anthony v. Virginia State Bar*, 270 Va. 601, 608-09 (2005)). However, the interpretation of the Rules of Professional Conduct involves questions of law which we review de novo. *See Brown v. Virginia State Bar ex rel. Sixth Dist. Comm.*, 302 Va. 234, 251 (2023).

### B. Wessel Violated Rule 1.3(b).

Rule 1.3(b) states: "A lawyer shall not intentionally fail to carry out a contract of employment entered into with a client for professional services but may withdraw as permitted under Rule 1.16." The representation agreement between Wessel and Perez stated that Wessel

6

would "handl[e] her civil claim for injuries and damages arising out of an accident . . . at Merrifield Gardens…" which could entail settlement or trial.

Wessel argues that he did not intentionally fail to represent Perez but instead acted with her best interests in mind. He argues, for instance, that if he had withdrawn when their fee disagreements first arose, she would have lost out on the possibility of a settlement. What Wessel fails to understand is that Perez should have been alerted to "his concerns" regarding trying the case as soon as they arose. If, after discussing his concerns with Perez, Wessel concluded that his relationship with Perez was irreparably broken and would interfere with his duty to his client to try her case, then he could have withdrawn under Rule 1.3(b), and Perez would have had the opportunity to obtain new counsel. While Wessel may believe that his decisions were in Perez's best interests, his undisclosed decision to not "try the case" yet maintain the façade that he intended to proceed to trial if necessary to persuade opposing counsel to settle unbeknownst to Perez, clearly demonstrates the conflict between Wessel's self-interest and those of his client.

Our independent examination of the entire record reveals that as early as mid-September of 2023, Wessel had decided that he would not take Perez's case to trial. Additionally, the record reflects that Wessel delayed communicating that decision to Perez until after October 10, 2023, mere days before her trial was scheduled to begin. Wessel makes no argument that his failure to communicate was accidental, nor does he contradict the assertion that he knew he was not going to try the case. Instead, Wessel chose to deliberately misrepresent his intentions to Perez. Unfortunately, Wessel persists in his belief that his unilateral determination to not try the case without advising his client of his intended course of conduct was in her best interests. We disagree.

7

Furthermore, and perhaps most importantly, Wessel failed to communicate his concerns about trying the case to Perez until the eve of trial. Under no plausible understanding of these circumstances can we conclude that Wessel's actions to deliberately deceive Perez were in her best interests. Wessel's deliberate delay only acted to force Perez to make a rushed decision and, as she testified, forced her to choose settlement over going to trial. In essence, Wessel's actions worked as a trap for Perez. Perez was experiencing severe financial difficulty during the pendency of her case, of which Wessel was aware. Wessel's deceit kept Perez in the dark until the last possible moment, forcing her to keep an attorney she no longer trusted and to accept a settlement, the option most beneficial to Wessel. In addition, Wessel's actions took away any reasonable opportunity she may have had to make a choice between settlement and trial.[3] Rather than explaining his situation and the potential consequences of withdrawal to Perez, he pretended to prepare for trial, *deceived his client*, and then pulled the rug out from under Perez at the last possible moment, forcing her to choose between a significant and likely devastating delay in any financial recovery or immediate settlement with lesser financial recovery.[4]

Wessel's decision to not try the case and to deceive his client about that decision, along with his deliberate failure to timely communicate his decision to his client, clearly demonstrate

---

[3] To put it another way, Perez was faced with a "Hobson's Choice"—either she accept settlement or continue with financially crippling litigation. The famous phrase stems from an early 17th century stable owner, Thomas Hobson, who developed a rotation system to keep his best horses from being overworked. Patrons were required to take the horse that stood closest to the door—or face a long journey with no horse at all. *See* Webster's Third New Int'l Dictionary 1076 (1993). Wessel created a similar situation where only one of the options he offered Perez—settlement—was viable, thus stripping her of any meaningful choice.

[4] We note that Stoney, Wessel, and Porto had initially valued the case at a minimum of $1.5 million dollars, while defense counsel had valued the case at over $2 million dollars. The actual settlement amount of $1.2 million dollars that Perez was forced to accept was a significant reduction in the recovery she may have been due.

his failure to carry out his contract of employment as well as a failure to serve Perez's best interests in violation of Rule 1.3(b). *See Bailey v. Commonwealth*, 38 Va. App. 794, 806 (2002) ("In addition, because his attorneys believed they could not serve his best interests, their continued representation of him would violate the Rules of Professional Conduct. Virginia Rule of Professional Conduct 1.3 (requiring a lawyer to serve his or her client's best interests) . . . Thus, withdrawal was required.").

As soon as Wessel determined that his disagreement with Perez regarding fees rendered him unable to fully carry out his responsibilities he should have advised her of the predicament (the consequences of withdrawal) and either withdrawn or reached an agreement with her to limit the scope of his representation. His failure to take such actions in a timely manner harmed his client and, consequentially, violated Rule 1.3(b).

C.  Wessel Violated Rules 1.16(a)(1) and 1.16(a)(3).

Rules 1.16(a)(1) and (a)(3) state, respectively:

"(a) Except as stated in paragraph (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if:
(1) the representation will result in violation of the Rules of Professional Conduct or other law. . . .
(3) the lawyer is discharged."

Given our determination above that Wessel violated Rule 1.3(b), Wessel also violated Rule 1.16(a)(1) when he continued to represent Perez after he decided to not try the case and failed to communicate his decision to Perez. Then, later, he violated Rule 1.16(a)(3) when he failed to withdraw for over a month after Perez terminated him. Not only did Wessel fail to withdraw, but he continued to attempt to exert control over the disbursement of the settlement funds even after he was terminated. This also constitutes a violation of Rule 1.16(a)(3).

9

Wessel's only argument in his defense on this issue is that the Rules do not mandate a specific timeframe within which he was obligated to withdraw, and thus his withdrawal in December, months after he was terminated, was appropriate and not a violation of the Rules. While the Rules are certainly silent as to a specific timeframe for withdrawal, the circumstances of this case, his failure to follow the advice of the VSB, and common sense dictate that Wessel should have at least moved to withdraw long before he did.

Wessel has provided no explanation as to why he did not, seasonably or otherwise, file a motion to withdraw after he was terminated. Furthermore, when Wessel contacted the VSB twice to ask for their advice, they advised him at each interval that he should withdraw—but he did not. Therefore, even though the Rules do not prescribe a specific timeframe for withdrawal, Wessel's decision to not try the case and then his subsequent firing were more than enough reason for him to immediately file a motion to withdraw with the trial court upon his termination. Wessel failed to do so and instead remained counsel of record in order to try to secure as much of the settlement funds for himself as he could. These actions merely reinforce the conclusion that Wessel's actions were motivated primarily by his own self-interest and not those of his client and certainly constitute a clear violation of Rule 1.16(a)(1) and (a)(3).

D.  Wessel Violated Rules 8.4(a) and 1.15.

Rule 8.4(a) states: "It is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another . . . ."

Rule 1.15(b)(4) states: "A lawyer shall . . . promptly pay or deliver to the client or another as requested by such person the funds, securities, or other properties in the possession of the lawyer that such person is entitled to receive . . . ."

The three-judge panel found that Wessel's attempts to prevent Stoney from distributing the settlement funds after Wessel was terminated by Perez violated Rule 8.4(a). In addition, Wessel's interference with the disbursement of the funds prevented the portion of the settlement that was undisputed from going to Perez immediately, violating Rule 1.15(b)(4).

Wessel's only argument against the three-judge panel's finding of a violation of Rule 8.4(a) is that he was not required to withdraw immediately after he was terminated and that the representation agreement between himself and Perez stated that any lenders and Wessel would be paid before she was. Wessel's argument against the finding of a violation of Rule 1.15(b)(4) was similar—that the representation agreement mandated that the lender and he be paid first, and that any dispute over fees needed to go to arbitration to be resolved.

Wessel does not contradict the assertion that he attempted to prevent Stoney from distributing the funds that should have rightfully gone immediately to Perez. At the maximum, $560,033[5] of the $1.2 million in settlement funds were in dispute, while the remaining funds were undisputed and could be immediately transferred to Perez. The Comment to Rule 1:15(b)(4) considers such a scenario and clearly specifies that "a lawyer may not hold funds to coerce a client into accepting the lawyer's contention . . . . The undisputed portion of the [settlement funds] shall be promptly distributed." Wessel fought to prevent any distribution schedule that did not pay him first, and by doing so, delayed Perez's receipt of her desperately needed recovery. Thus, Wessel's actions violated Rules 8.4(a) and 1.15(b)(4).

"The relationship between a lawyer and his client is a fiduciary relationship, one which commands the highest fidelity to a most solemn trust, for the lawyer is the expert and the client is

---

[5] This includes a 40% fee ($480,000) plus other costs including a loan taken out by Wessel prior to trial ($80,033).

11

utterly dependent upon his knowledge, his skill, and his honor." *Shipman v. Kruck*, 267 Va. 495, 505 (2004). "Since the attorney-client relationship is based upon trust and confidence, a lawyer has a heightened duty to protect those obligations." *Brown*, 302 Va. at 253 (quoting Va. Legal Ethics Op. 1853 at *4.). While Wessel's "knowledge and skill" resulted in a settlement, it did not serve his client's best interests and his actions in carrying out his responsibility to Perez do not reflect the honor expected of a Virginia lawyer. Instead of protecting his client and seeking to provide her with the relief she desperately needed, Wessel prioritized enriching himself. His actions are inexcusable, and we do not condone any such behavior from an attorney licensed in this Commonwealth.

## III. CONCLUSION

For the forgoing reasons, the judgment of the Fairfax circuit court is affirmed.

*Affirmed*.